# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

CORRADINO D. CAPOZZI,

$\qquad$ Plaintiff,

v. $\qquad$ 3:14-CV-325
(GTS/ATB)

COMMISSIONER OF SOCIAL SECURITY,

$\qquad$ Defendant.

BRENT M. WHITING, ESQ., for Plaintiff
FERGUS KAISER, Special Asst. U.S. Attorney for Defendant
ANDREEA L. LECHIETNER, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable

Glenn T. Suddaby, United States District Judge, pursuant to 28 U.S.C. § 636(b) and

Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## I. PROCEDURAL HISTORY

On January 11, 2007, plaintiff "protectively filed"[1] an application for Disability

Insurance Benefits ("DIB"). (Administrative Transcript ("T") 143-44). Plaintiff alleged

disability due to heart failure. (T. 165). At the time of his application, plaintiff was

---

[1] The term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. §§ 404.630, 416.340. If a statement meeting the requirements of the regulations is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a later date. Although the plaintiff's application itself does not indicate the protective filing date, his "Disability Determination and Transmittal" indicates, and all parties agree, that the "Filing Date" was "1/11/07. (T. 51) (*See* Def.'s Br. at 1).

awaiting a heart transplant. (*Id.*) On March 8, 2007, the Commissioner determined that plaintiff was disabled as of November 8, 2006. (T. 20, 51). On November 22, 2011, the Commissioner determined that plaintiff's disability had ceased, and plaintiff was no longer disabled as of that date. (T. 20, 52-53, 57-59 (cessation notice)). The Commissioner's determination was upheld on reconsideration, following a hearing held by a State Agency Disability Hearing Officer which was held on February 22, 2012. (T. 20, 66-85). Plaintiff then filed a request for a hearing and a request that he continue to receive disability benefits while he appealed the termination of benefits. (T. 86-89).

On August 9, 2012, Administrative Law Judge ("ALJ") Elizabeth Koennecke held a hearing at which plaintiff appeared with his attorney and testified. (T. 36-50). In a decision dated August 22, 2011, the ALJ determined that plaintiff was no longer disabled as of November 22, 2011. (T. 20-30). The ALJ's determination became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on January 31, 2014. (T. 1-4).

## II.   GENERALLY APPLICABLE LAW

### A.   Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more

than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## B.    Standard for Initial Award and Termination of Benefits

A plaintiff seeking disability insurance benefits or Supplemental Security Income ("SSI") disability benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a) (3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

In an initial determination of disability, the Commissioner uses a five step analysis. 20 C.F.R. § 404.1520.

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the Commissioner  will consider him [per se] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian v. Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013); *see* 20 C.F.R. §§ 404.1520, 416.920.  The plaintiff has the burden of establishing disability at the first four steps.

However, if the plaintiff establishes that his impairment prevents him from performing his past work, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *Selian*, 708 F.3d at 418 & n.2.

The regulations provide that after the Commissioner makes a finding of disability, this finding is evaluated "from time to time"[2] to determine if the claimant is still eligible. *See* 42 U.S.C. § 423(f); 20 C.F.R. §§ 404.1590, 404.1589. To determine whether a claimant's disability has ended, the Commissioner has developed a multi-step[3] analysis, known as the "Continuing Disability Review" ("CDR") process. 20 C.F.R. § 404.1594(f). Termination of benefits may occur when there is substantial evidence to show that a "medical improvement" ("MI") restores the recipient's ability to work. *Deronde v. Astrue*, No. 7:11-CV-998, 2013 WL 869489, at *2 (N.D.N.Y. Feb. 11, 2013) (citing inter alia 20 C.F.R. § 1594; *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2003)). MI is defined as "any decrease in the medical severity of [the claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [he or she was] disabled or continued to be disabled." *Id.* (citing inter alia 20 C.F.R. § 404.1594(b)(1)). The Commissioner must compare the current medical

---

[2] Section 404.1590 provides when, and how often, the Commissioner will conduct the this evaluation.

[3] Section 1594 is entitled "How we will determine whether your disability continues or ends," and the section contains a lengthy discussion of how the Commissioner periodically reviews favorable disability determinations for medical improvement ("MI"). The section includes definitions of various terms, together with examples. *See* 20 C.F.R. § 1594(b)(1)-(b)(7). The evaluation steps referred to above are listed in section 1594(f).

severity of plaintiff's impairment to the severity of that impairment at the time of the most recent favorable decision. *Douglass v. Astrue*, 496 Fed. App'x 154, 155 (2d Cir. 2012) (citing *Veino*, 312 F.3d at 586-87). This concept is referred to as the "point of comparison." 20 C.F.R. § 404.1594(b)(7).

The multi-step analysis is as follows:

(1)     Is the plaintiff engaging in substantial gainful activity ("SGA"). If so, the Commissioner will find that the disability has ended.

(2)     If not, the Commissioner determines whether the plaintiff has an impairment or combination of impairments which meets or equals the severity of an impairment listed in Appendix 1 of Part 404 ("Listed Impairment). If so, the disability will continue.

(3)     If not, the Commissioner determines whether there has been MI as defined in 20 C.F.R. § 404.1594(b)(1).

(4)     If there has been MI, the Commissioner determines whether the MI is related to the plaintiff's ability to work under 20 C.F.R. § 404.1594(b)(1) through (b)(4).

(5)     If there has been no MI, or the MI is not related to the plaintiff's ability to work, the Commissioner determines if any of the "exceptions"[4] in

---

[4] There are two groups of "exceptions" to the requirement for MI. 20 C.F.R. 404.1594(d) and (e). These exceptions allow the Commissioner to terminate benefits even if there has been no MI. The first group of exceptions deal with the availability of advances in medical or vocational therapy, related to a claimant's ability to work (§ 404.1594(d)(1)); substantial evidence that the plaintiff has undergone vocational therapy related to his or her ability to work (§ 404.1594(b)(2)); new or improved diagnostic techniques show that the claimant's impairment was not as disabling as it was considered at the time of the most recent favorable decision (§ 404.1594(d)(3)); substantial evidence demonstrates that the most recent favorable decision was made in error (§ 404.1594(d)(4)); or plaintiff is currently engaging in SGA and is not entitled to a trial work period pursuant to section 404.1592. The second group of exceptions to the necessity for MI include whether a prior favorable determination was obtained fraudulently (§ 404.1594(e)(1)); plaintiff fails to cooperate pursuant to section 404.911 (§ 404.1594(e)(2)); the Commissioner is unable to find the plaintiff (§ 404.1594(e)(3)); or the plaintiff fails to follow prescribed treatment which would be expected to restore his or her ability to perform SGA (§ 404.1594(e)(4)).

paragraphs (d) and (e) apply.

(6)     If there has been MI or one of the first group of exceptions to MI applies, the Commissioner will determine whether all the plaintiff's current impairments are "severe."

(7)     If plaintiff's impairments are severe, then the Commissioner will assess the plaintiff's RFC, based on all the current impairments, and determine whether the plaintiff can perform his or her prior work.  If so, disability will cease.[5]

(8)     If the plaintiff cannot perform his or her prior work, then the Commissioner will consider whether the plaintiff can perform other work in the national economy, based upon the plaintiff's age, education, and past work experience.  If so, disability will cease.  If not, disability will continue.

20 C.F.R. § 404.1594(f)(1)-(f)(8) *cited in Deronde*, 2013 WL 869489 at *2 n.8.  These steps are intended to assure that the review of disability cases is conducted in a uniform manner, and that "any decisions to stop disability benefits are made objectively, neutrally and are fully documented." *Deronde*, 2013 WL 869489 at *2 (quoting 20 C.F.R. § 404.1594(f)).

Pursuant to this multi-step standard, the Commissioner has the burden of persuasion in showing that MI has occurred.[6] *Abrams v. Astrue*, No. 06-CV-689, 2008

---

[5] This regulation also provides that if there is insufficient evidence of a plaintiff's past relevant work to make the determination under this subsection, the Commissioner will proceed to the final step of the analysis. 20 C.F.R. § 404.1594(f)(9).

[6] The court notes that in *Deronde v. Astrue*, the court stated that under this analytical model, "the burden rests with the Commissioner at every step." 2013 WL 869489, at *3.  However, there are other cases in which the court states that the "'medical improvement standard requires the Commissioner to meet a burden of showing, by substantial evidence, that a medical improvement has taken place in a claimant's ability to perform work activity.'" *Chavis v. Astrue*, No. 5:07-CV-18, 2010 WL 624039, at *4 (N.D.N.Y. Feb. 18, 2010) (quoting *Mumm v. Comm'r of Soc. Sec.*, No. 5:06-CV-

WL 4239996, at *2 (W.D.N.Y. Sept. 12, 2008) (citing *Suriel v. Comm'r of Soc. Sec.*, No. CV-05-1218, 2006 WL 2516429, at *4 (E.D.N.Y. Aug. 29, 2006); *Lopez v. Barnhart*, 3:05-CV-19, 2006 WL 1272644, at *2 n.2 (D. Conn. Mar. 1, 2006)). If the Commissioner reaches the eighth step, the Commissioner has the limited burden to show that there is other work that the plaintiff can perform in the national economy. *See* 20 C.F.R. § 404. 1594(b)(5) ("[i]n most instances, *we must show* that you are able to engage in [SGA] before your benefits are stopped." (emphasis added)).

## III.  **FACTS**

Plaintiff was born on January 29, 1967, making him 47 years old. (T. 143). He testified at his hearing that he has a high school education plus one year of college. (T. 41). Prior to his disability, plaintiff worked for almost seven years as a laborer for the City of Binghamton Sewer Department. (*Id*). In a decision dated March 8, 2007, plaintiff was determined to be disabled beginning November 8, 2006. (T. 22, 51). The Commissioner found that plaintiff's chronic heart failure met the requirements for a Listed Impairment under 20 C.F.R. Pt. 404, Subpt. P, App 1 § 4.02. (*Id.*)

Plaintiff had a heart transplant on March 4, 2007 at Columbia Presbyterian Medical Hospital in New York City. (T. 42, 395). Plaintiff is still monitored for post-transplant rejection. (T. 42-43). He is treated in New York City by Dr. Susan Restaino, a pre and post-cardiac transplant physician. (T. 42). Plaintiff takes anti-rejection

---

989, 2008 WL 686787, at *9 (N.D.N.Y. Mar. 10, 2008)).  The "medical improvement" step of the analysis is only the third step.  It is unclear whether the plaintiff bears the burden in between MI and the last step, where the burden is again shifted, by the regulation itself, to the Commissioner to show that plaintiff can perform other SGA.

medication and has semi-annual biopsies to determine whether he is rejecting the transplant.[7] (T. 42). He has regular medical visits to his local physicians: cardiologist, Dr. John DiMenna, and his primary care physician, Dr. Louis Mateya. (T. 42). Plaintiff testified that he has developed kidney problems due to the anti-rejection medications. (T. 42-43). He was referred to Dr. Jai Rakhakrishnan in New York City for his renal issues. (T. 42-43). He also has high blood pressure for which he is taking medication. (T. 45, 46). He is also taking "preventative" medication for high cholesterol. (*Id.*)

Plaintiff testified that he has been doing as well "as expected." (T. 44). However, he will have to be monitored "indefinitely" for rejection of the transplant. (T. 44). The ALJ asked plaintiff if Dr. Restaino gave him any "recommendations as to things you should avoid or restrictions upon your activities." (T. 44). Plaintiff testified that the "main thing" was "environmental." (T. 44). Dr. Restaino told plaintiff that he must be careful with molds and bacteria and must avoid getting sick because an increase in white blood cells could "attack" the transplant.[8] (*Id.*) The only side effects from his medications are the kidney problem and mood swings. (T. 45). His kidney problem is being treated with diet. (T. 43).

Plaintiff lives at home with his mother and grandmother. His mother does the cooking, but plaintiff can go to the grocery store and shop. (T. 48). He does not do any

---

[7] Plaintiff testified that although the biopsies are done every six months, ultimately they will be cut down to once per year "at the discretion of the doctor." (T. 43).

[8] Plaintiff testified that he had to stay away from "sick people" and "construction sites." (T. 46). He can not eat raw fish or undercooked meats. He must not eat at buffets. (*Id.*) He testified that his immune system is compromised, and it also takes him longer to recover if he does get sick. (*Id.*)

yard work because of the dust and grass clippings from the mower, and he was "not sure" about staying away from fumes or odors. (*Id.*) Plaintiff testified that he must avoid being in a setting with a large number of people, but that he occasionally goes out because he "can't sit in the house, . . . live in a bubble." (T. 47). He occasionally goes to a hockey game unless it is flu season. (*Id.*) He goes to the "casino" twice per year. (T. 49). He testified that he is careful doing "recreational things," but if he "feel[s] like going," he will go. (*Id.*) He will "extend himself." (*Id.*) He stated that he does not go to "gyms" because of environmental reasons. (*Id.*)

The transcript contains medical records from before and after plaintiff's heart transplant. The records from Columbia Presbyterian Hospital and Dr. Restaino, include descriptions of the events leading to plaintiff's transplant together with the follow-up appointments to ensure that the transplant is not being rejected. (T. 246-81, 295-318 (pre-transplant records and evaluations for surgery); 325-50; 407-70 (post transplant evaluations)). Dr. Restaino also submitted an RFC evaluation, dated June 26, 2012. (T. 475-81). There are records from Dr. Jai Radhakrishnan, who is also at Columbia Presbyterian Hospital and to whom plaintiff was referred for an evaluation of his renal issues. (T. 381-84). The record contains only one report by primary care physician Dr. Mateya, dated October 6, 2011. (T. 377-80, 403-406)[9].

Dr. DiMenna, plaintiff's local cardiologist, referred plaintiff to Columbia Presbyterian and Dr. Restaino for evaluation of his heart condition prior to the

---

[9] Although the document index states that there are two separate reports, one dated January 6, 2011 and one dated October 6, 2011, they are duplicates of the October 6, 2011 report.

transplant. (T. 287). The record contains several reports from Dr. DiMenna, also monitoring plaintiff's condition after the transplant. (T. 351-65; 398-401; 471-74). Dr. DiMenna also completed a Medical Source Statement, dated July 11, 2012. (T. 482). Relevant details regarding the medical and other evidence, including the medical opinion evidence, are discussed below as necessary to address the issues raised by plaintiff.

## IV.  THE ALJ'S DECISION

After discussing the law applicable to termination cases, ALJ Koennecke found that plaintiff's "comparison point decision" or CPD was March 8, 2007, the date of his most recent favorable medical decision. (T. 22). At the time of his CPD, plaintiff had "chronic heart failure" which met section 4.02 of the Listing of Impairments, rendering him totally disabled. (*Id.*) Proceeding to the next step of the analysis, the ALJ found that plaintiff did not engage in substantial gainful activity through November 22, 2011, the date that plaintiff's disability "ended." (*Id.*)

During that time, plaintiff did not develop any additional "severe" impairments, and since the CPD, plaintiff's only "severe" impairment is "coronary artery disease status post heart transplant." (*Id.*) The ALJ found that plaintiff's kidney problems and "mood swings" were not severe within the meaning of the regulations. (T. 22-23). The ALJ noted that plaintiff was referred to Dr. Radhakrishan, who evaluated plaintiff for renal insufficiency and found that there was no evidence of nephrolithiasis or obstruction, and that plaintiff's examination was "within normal limits." (T. 23). Plaintiff testified that the condition was caused by his medications and that his

creatinine levels are "higher than they are supposed to be," but that the condition is managed by limiting protein within his diet. (T. 23). No acceptable medical source has indicated that plaintiff's kidney condition imposes any limits on plaintiff's ability to perform basic work activities. (*Id.*)

The ALJ also evaluated plaintiff's claim that his medications cause "mood swings." (T. 23). The ALJ found that the alleged "mood swings" do not rise to the level of a medically determinable impairment, stating that symptoms alone do not establish the existence of an impairment. Because there is no medically determinable impairment, the ALJ was not required to analyze plaintiff's "mood swings" further.

The ALJ found that since November 22, 2011, plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a Listed Impairment. (T. 23). The ALJ compared plaintiff's current condition to Listing 4.02, but determined that plaintiff's impairment no longer met the severity of that listing. ALJ Koennecke determined that medical improvement occurred as of November 22, 2011, and that there had been a decrease in the severity of plaintiff's original impairment. (T. 23).

In support of her conclusion, the ALJ reviewed the treatment notes from Dr. DiMenna from November 2010, revealing that plaintiff denied chest pain, dizziness, palpitations, and/or shortness of breath. (T. 23). Dr. DiMenna found that plaintiff was doing well and had no heart failure or angina. Although plaintiff was being monitored for hypertension, there were no limitations or restrictions as a result. (T. 23-24). The ALJ noted that the plaintiff reported walking on a treadmill for forty minutes at a time,

and that Dr. DiMenna's progress notes encouraged increasing that exercise to one hour. (T. 24). The ALJ compared Dr. Restaino's RFC evaluation from 2007, in which she estimated that plaintiff could not sit, stand, or walk for more than two hours in an eight hour day, with her evaluation from 2012, in which she estimated that plaintiff could sit for up to six hours in one day (three hours at one time), stand for one hour, and sit for one hour. (T. 24).

The ALJ then found that plaintiff's MI related to his ability to work because as of November 22, 2011, plaintiff no longer had a listed impairment. (T. 24). However, as of November 22, 2011, plaintiff's impairment was still "severe." The ALJ determined that plaintiff's "severe" impairment limited him to sedentary work, with "rare exposure to humidity and the need to wear a mask if using public transportation." (T. 24). In making this determination, the ALJ reviewed the medical evidence relating to the period after plaintiff's heart transplant, particularly evidence from 2011 and 2012 which indicated that plaintiff was doing well, and engaged in a variety of daily activities, including going to occasional hockey games, attending religious services, shopping, and going to the casino occasionally. (T. 25-26).

The ALJ also found that the objective medical evidence of record did not support the intensity, frequency, or duration of plaintiff's complaints. (T. 26). Although plaintiff claimed that it would be difficult to maintain a job because of all his follow up appointments, plaintiff was only monitored twice per year in New York City, he only sees Dr. Mateya once per year and sees Dr. DiMenna on average once every three months. (T. 26). Ultimately, the ALJ found that her RFC assessment was supported by

Dr. Restaino's RFC evaluation, together with plaintiff's stable progression and ability to engage in work activities consistent with sedentary work. (T. 27).

The ALJ found that plaintiff could not perform his previous work which required him to lift up to 100 pounds. (T. 27). However, based on the RFC for a full range of sedentary work, his age, education, and prior work experience, the ALJ used the Medical Vocational Guidelines to find that plaintiff was not disabled and that there were a significant number of jobs in the national economy that he could perform. (T. 28). In making this final determination, the ALJ considered that there was no evidence that plaintiff's environmental restrictions significantly affected the potential unskilled sedentary base.[10] Thus, the ALJ found that plaintiff's disability ceased as of November 22, 2011. (T. 29).

## V.   ISSUES IN CONTENTION

Plaintiff raises the following arguments:

(1)    The ALJ misapplied the treating physician rule. (Pl.'s Br. at 6-7).

(2)    The Administration had a duty to order a consultative examination. (Pl.'s Br. at 8).

(3)    There is insufficient medical evidence to support a finding of medical improvement and/or an improved ability to perform basic work activities.

---

[10] The court notes that the ALJ appears to have made a typographical error. (T. 28). The ALJ stated that plaintiff's environmental restrictions did not significantly affect the potential "light" occupational base. However, the ALJ clearly meant the "sedentary" occupational base because there was never a finding that plaintiff could perform "light" work, and the last line of the paragraph stated that "there is no evidence that a reduction in the claimants exposure to humidity, noise, or dust restricts the nonexertional capabilities to a level below those needed to perform unskilled work, *in this case at the sedentary level*." (T. 28) (emphasis added). The ALJ's error would clearly be harmless and does not affect this court's decision.

(Pl.'s Br. at 8-10).

(4)     The Administration erred in failing to use a Vocational Expert ("VE").

Defendant argues that the Commissioner's determination is supported by substantial

evidence and should be affirmed.  For the following reasons, this court agrees with the

defendant and will recommend dismissing the complaint.

## VI.     **MEDICAL IMPROVEMENT**

### A.     **Legal Standards**

Medical improvement is specifically defined in the regulations.

> Medical improvement is any decrease in the medical severity
> of your impairment(s) which was present at the time of the
> most recent favorable medical decision that you were disabled
> or continued to be disabled.  A determination that there has
> been a decrease in medical severity must be based on changes
> (improvement) in the symptoms, signs and/or laboratory
> findings associated with your impairment(s). . . .

20 C.F.R. § 404.1594(b)(1).  As stated above, MI is only one part of the termination

analysis.  First, the Commissioner finds that there is medical improvement, and then,

based upon whether that improvement is related to the plaintiff's ability to perform

work, the analysis continues.  Ultimately, the Commissioner will determine whether

notwithstanding the medical improvement, the plaintiff is still disabled.

### B.     **Application**

Although this argument is not the first in plaintiff's brief, the concept of MI is

considered prior to any of the other relevant factors in the Commissioner's analysis.

Plaintiff argues that the ALJ erred in finding that there was MI "and/or an improved

ability to perform basic work activities." (Pl.'s Br. at 8). It is unclear whether plaintiff is arguing that the MI determination was incorrect or whether the totality of the analysis was incorrect.[11] MI is only the third step in the applicable standard. MI only involves determining whether the plaintiff's impairment is less severe than it was at the time of the most recent favorable decision. It is clear that plaintiff's condition has improved. Because of his heart transplant, he no longer meets the severity of a listed impairment. The medical records clearly support this finding. The fact that MI occurs, does not mean that the plaintiff is no longer disabled, it only means that the ALJ proceeds to consider the other steps in the analysis to determine if, plaintiff is still disabled despite the MI, or if he is now able to perform substantial gainful activity despite his impairment. Thus, the ALJ's finding that plaintiff's impairment improved at step three is supported by substantial evidence.

## VII.  TREATING PHYSICIAN/RFC

### A.  Legal Standards

#### 1.  Treating Physician

While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and not inconsistent with other substantial evidence. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is *not*

---

[11] Plaintiff addresses other steps of the analysis in his brief. Thus, the court will interpret this section as arguing that the MI determination was not supported by substantial evidence, and will address plaintiff's other points below.

required to give the opinion controlling weight. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must, however, properly analyze the reasons that a report of a treating physician is rejected. *Id.* An ALJ may not arbitrarily substitute his/her own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

### 2. RFC

Residual functional capacity ("RFC") is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R. §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Id.* (citing, *inter alia, Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984)). RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *Id.* (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).

The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, 5:09-CV-1120 (DNH/GHL), 2010 WL 3825629, at *6 (N.D.N.Y. Aug. 17, 2010) (citing SSR 96-8p, 1996 WL 374184, at *7).

### B.    Application

Plaintiff argues that the ALJ failed to properly analyze the RFC evaluation of plaintiff's treating cardiologist, Dr. Restaino. Dr. Restaino submitted an RFC evaluation dated June 26, 2012. (T. 475-81). Dr. Restaino has been treating plaintiff since 2006, and now monitors his post-transplant condition. (T. 247, 475). In her June 26, 2012 RFC evaluation, Dr. Restaino stated that plaintiff can lift up to ten pounds occasionally; sit for three hours at a time, for a total of six hours in an eight hour day; and stand and walk for one hour each in an eight hour day. (T. 477). Dr. Restaino also stated that plaintiff can "occasionally" reach overhead and generally; handle; finger; feel; and "push/pull" with both hands. (T. 478). He can "occasionally" operate foot controls with either foot; can "frequently" climb stairs and ramps; but only "occasionally" climb ladders or scaffolds, balance, stoop, kneel, crouch or crawl. (T. 478-79). Plaintiff could frequently drive and "occasionally" tolerate exposure to unprotected heights; moving mechanical parts; extreme cold or heat; and vibrations. (T. 480). However, he would never be able to be exposed to humidity and wetness; dust; odors; fumes; or pulmonary irritants. (*Id.*)

Dr. Restaino also stated that plaintiff could shop; travel alone; ambulate without assistance; walk a block at a reasonable pace without assistance; climb a few steps at a

reasonable pace; prepare simple meals and feed himself; care for his personal hygiene; and sort, handle and use papers and/or files. (T. 481). However, plaintiff would have to wear a mask while using public transportation due to his daily use of immunosuppressant medication.[12]

The ALJ gave "***great weight***" to Dr. Restaino's assessment of the plaintiff's ability to sit, stand and/or walk during the course of an 8-hour workday, with some environmental restrictions. (T. 27) (emphasis added). However, the ALJ rejected Dr. Restaino's finding that plaintiff could only "occasionally" use his hands for reaching, fingering, handling, pushing and pulling because there was no "objective medical evidence" to support this assessment. (T. 27).

Plaintiff argues that the ALJ erred in accepting only part of Dr. Restaino's assessment. Plaintiff argues that Dr. Restaino's statement that plaintiff has only "moderate" use of his hands for reaching, handling, fingering, feeling, pushing and pulling "[p]resumably is based on plaintiff's ability to consistently exert himself over the course of an eight . . . hour day." (Pl.'s Br. at 7).

The court would point out that the ALJ gave great weight to the portion of Dr. Restaino's RFC which described the essential functions of sedentary work, the ability to lift no more than ten pounds; the ability to sit for a total of six hours in an eight hour day; and the ability to stand and/or walk for a total of two hours in an eight hour day (stand for one hour and walk for one hour). *See* Social Security Ruling ("SSR") 96-9P, 1996 WL 374185, at *3 (1996). SSR 96-9P states that sedentary work also involves

---

[12] The anti-rejection medications are also immunosuppressant. (T. 481).

"other activities, classified as 'nonexertional.'"[13] These include the capacity to see; manipulate; and understand, remember, and carry out simple instructions. *Id.* The "other activities" do not have any specific amount of time associated with them. In addition, Dr. Restaino stated in another part of the same RFC evaluation that plaintiff could "sort, handle, or use paper/files." (T. 481). Handling and sorting papers and/or files requires "reaching, handling, fingering, and manipulating."

"Reaching" and "pushing/pulling" are not mentioned in the SSR in the *definition* of sedentary work, even though reaching is "required in almost all jobs," and a reaching limitation "may eliminate a large number of occupations a person could otherwise do." *Selian v. Astrue*, 708 F.3d 409, 422 (2d Cir. 2013) (citing SSR 85-15, 1985 WL 56857, at *7)). Sedentary jobs, however, "generally do not involve overhead reaching, pushing, or pulling." *Shupe v. Astrue*, No. 07 Civ. 7961, 2010 WL 3785155, at *14 (S.D.N.Y. Aug. 3, 2010); *Sova v. Colvin*, No. 7:13-CV-570 (TJM), 2014 WL 4744675, at *8 (N.D.N.Y. Sept. 23, 2014) ("sedentary work is not substantially eroded where a claimant has only overhead reaching limitations, as opposed to limitations reaching in any direction") (collecting cases). SSR 96-9p specifically states that "[l]imitations or restrictions on the ability to push or pull will generally have little effect on the unskilled sedentary occupational base." 1996 WL 374185, at *6.

No other physician opines that plaintiff has any limitation reaching, handling, fingering, or feeling. In fact, no other examining physician even discusses these

---

[13] A "nonexertional" limitation is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only the claimant's ability to meet the demands of jobs other than the strength demands. 20 C.F.R. §§ 404.1569a(c).

abilities.  Dr. DiMenna's July 18, 2011 report shows that plaintiff was "doing well" and was exercising in an attempt to lose weight. (T. 359-60).  On May 7, 2012, Dr. DiMenna reported that plaintiff felt that he was not very active "other than going to the gym,"[14] and was eating too much.[15] (T. 471).  On November 2, 2011, Dr. DiMenna reported that plaintiff's hypertension was worsening, and he was experiencing weight gain. (T. 362).  Plaintiff told Dr. DiMenna that he was walking on a treadmill three times a week for forty minutes at a speed of 3.5 miles per hour at a 7.5% grade.  The doctor suggested that plaintiff increase the exercise to daily "and perhaps walking for an hour at a time." (*Id.*)  Plaintiff told Dr. DiMenna that he was feeling well.  There was no mention of any other limitations and no discussion of problems with his hands. (T. 363).  Dr. DiMenna's Medical Source Statement does not include an RFC evaluation. On October 6, 2011, Dr. Mateya performed a physical examination and found that plaintiff's cardiac examination was "normal" and he had good exercise tolerance. There was no sign of transplant rejection, and no indication of any problems with his hands.[16] (T. 377-80).

    The ALJ was correct in stating that Dr. Restaino's opinion regarding any

_____

[14] Plaintiff testified that he did not go to "gyms" because of the environmental restrictions. (T. 49).

[15] During this examination, plaintiff told Dr. DiMenna that there was "some talk about him going back to work," and that plaintiff was in "legal negotiations" about that. (T. 471).  However, plaintiff's main concern was not that he would be unable to work, but that plaintiff did not "feel that he would be able to get a job with benefits considering all of his required lab testing and physician visits." (T. 471).  Although this may be a legitimate concern, it is not relevant to the disability determination.

[16] Dr. Mateya also stated that "[i]nterestingly he reports that his physician in NYC has encouraged him to remain unemployed and out of public circulation to reduce risk of infection." (T. 379).  There is nothing in Dr. Restaino's reports that would indicate such a recommendation.

limitations with the use of plaintiff's hands is not supported by the medical record. Plaintiff is also incorrect that these capabilities are based on plaintiff's inability to "exert" himself because the SSR categorizes them as "nonexertional" components of sedentary work. Thus, the ALJ's determination that plaintiff could perform the exertional requirements of sedentary work is supported by substantial evidence.

The ALJ also considered the requirement that plaintiff wear a mask if taking public transportation (although the court notes that plaintiff drives himself, and even Dr. Restaino's RFC acknowledges that plaintiff can drive "frequently." (T. 480). The ALJ specifically found that plaintiff's environmental restrictions, including the necessity of wearing a mask while using public transportation and the avoidance of dust, fumes, and exposure to humidity, "have very little effect on the exertional occupational base." (T. 28). SSR 96-9P confirms the ALJ's finding by stating that "few occupations in the unskilled sedentary occupational base require work in environments with extreme cold, extreme heat, wetness, humidity, vibration, or unusual hazards." 1996 WL 374185, at *9. Thus, the ALJ's determination that plaintiff could perform the full range of sedentary work, and her rejection of a small part of Dr. Restaino's RFC evaluation are supported by substantial evidence in the record.

## VIII. <u>DEVELOPING THE RECORD/CONSULTATIVE PHYSICIAN</u>

### A. **Legal Standards**

Given the remedial intent of the Social Security statute and the non-adversarial nature of benefits proceedings, an ALJ has an affirmative duty, even if the claimant is represented by counsel, to develop the medical record if it is incomplete. *Moran v.*

*Astrue*, 569 F.3d 108, 112 (2d Cir. 2009); *Batista v. Barnhart*, 326 F. Supp. 2d 345, 353 (E.D.N.Y. 2004) (although an ALJ's obligation to develop the record is heightened where the claimant appears pro se, the duty still exists even where the claimant is represented by counsel during the administrative proceedings). The court must ensure that the plaintiff has had a full hearing under the regulations. *Moran, supra.*

An ALJ's failure to adequately develop the record is a separate basis for reversing the decision and remanding the case for further review. *Id.* at 114-15. When the record evidence is inadequate to determine whether an individual is disabled, then the ALJ must contact the claimant's medical sources to obtain more information. *Reyes v. Colvin*, No. 13-CV-3464, 2015 WL 872075, at *4 (S.D.N.Y. Feb. 25, 2015) (citing *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998); *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 344 (E.D.N.Y. 2010)).

In those situations, the ALJ may request medical records from a claimant's treating sources, a new report, or a more detailed report. *Reyes, supra* (citation omitted). Prior to 2012, the ALJ's duty was not limited to circumstances in which there was a "gap" in the record, but extended to those instances in which the treating source's report contained a "conflict or ambiguity" that needed to be resolved. *Reyes*, *supra* (citing 20 C.F.R. § 404.1512(e)(1)(2010)). However, as of March 2012, prior to the ALJ's hearing in this case, the regulation was amended to delete the this requirement.[17] *Id.* (citing *Walker v. Coughlin*, No. 12-CV-116S, 2013 WL 5487443, at *3 n.4

_____

[17] Former 20 C.F.R. § 1512(e) with the relevant changes is currently codified at 20 C.F.R. § 404.1512(d).

(W.D.N.Y. Sept. 30, 2013). Additionally, in *Tankisi v. Comm'r of Soc. Sec.*, 521 Fed. App'x 29, 33-34 (2d Cir. 2013), the court held that, even prior to the amendment, remand was not always required even if the ALJ failed in his or her duty to request opinions, "particularly where . . . the record contains sufficient evidence from which an ALJ can assess the [plaintiff's RFC]." *Id.* (citations omitted).

The regulations contain extensive criteria for purchasing "consultative examinations." 20 C.F.R. §§ 1519-1519t. Section 1519 explains that a consultative examination is a physical or mental examination that the agency purchases for a claimant at the agency's expense. The decision to purchase such an examination is made on a case-by-case basis in accordance with the regulations which follow section 1519. 20 C.F.R. § 404.1519. The "consultative examination" may be requested from a claimant's own treating source "or another medical source." *Id.*

In general, a consultative examination may be purchased "[i]f [the agency] cannot get the information we need from [the claimant's] medical sources. 20 C.F.R. § 1519a(a) (citing 20 C.F.R. §§ 404.1512, 404.1520b). Section 404.1512 governs "Evidence" in general. Section 404.1512(d) discusses the Commissioner's duty to develop the record, and section 404.1512(e) provides that the Commissioner may ask a claimant to attend one or more consultative examinations, but specifies that every effort will be made to get information from treating sources first. Section 404.1520b is entitled "How we consider evidence." This regulation provides that the Commissioner **may** recontact a claimant's treating source. *Id.*

B.    **Application**

Plaintiff argues that the ALJ should have obtained a consultative examination, and to the extent that the ALJ "appears to simply discredit" Dr. Restaino, "as opposed to crediting the non-examining physician . . . , the Law Judge failed to seek out other medical evidence." (Pl.'s Br. at 8). As stated above, the ALJ did not "simply discredit" Dr. Restaino. In fact, she gave Dr. Restaino's opinion ***great weight*** to the extent that it described plaintiff's ability to perform the essential functions of sedentary work. The ALJ also accepted the environmental restrictions from Dr. Restaino's RFC evaluation. The fact that the ALJ did not accept the restrictions on manipulating, feeling, and handling did not require either recontacting Dr. Restaino, or obtaining a consultative opinion because the record contains sufficient evidence to support the ALJ's findings.

At the hearing, plaintiff was asked about "lifting" and "pushing and pulling." (T. 47). Plaintiff testified that Dr. Restaino told him that he could not engage in "constant" or "repetitious lifting." However, Dr. Restaino told plaintiff that if he wanted to lift something, he could. (T. 47). As stated above, sedentary work does not require constant or repetitive lifting, pushing, or pulling. Plaintiff never mentioned anything about being limited in handling, manipulating or feeling during his testimony. The only limitations he discussed during his testimony were the environmental limitations that the ALJ accepted as part of her analysis.

Plaintiff argues that the ALJ must have relied upon the non-examining physician because the non-examining physician's RFC was more consistent with the ALJ's assessment of plaintiff's abilities. (T. 367-71). This court does not agree. First, the ALJ did not mention the non-examining physician's RFC in her decision. In addition,

the non-examining physician opined that plaintiff only needed to avoid "concentrated exposure" to extreme cold and heat, but he had no limitations for exposure to wetness, humidity, or fumes, odors, dusts, gases, and poor ventilation. (T. 369). The ALJ accepted the treating physician's determination with respect to plaintiff's exertional and environmental limitations. Thus, the ALJ did not rely solely upon the non-examining physician's RFC.[18]

## IX.  **VOCATIONAL EXPERT**

### A.   **Legal Standards**

Once the plaintiff shows that he cannot return to his previous work, the Commissioner bears the burden of establishing that the plaintiff retains the RFC to perform alternative substantial gainful work in the national economy. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004). In the ordinary case, the ALJ carries out this fifth step of the sequential disability analysis by applying the applicable Medical-Vocational Guidelines ("the Grids"). *Id.* The Grids divide work into sedentary, light, medium, heavy, and very heavy categories, based on the extent of a claimant's ability to sit, stand, walk, lift, carry, push, and pull. 20 C.F.R. Pt. 404, Subpt. P, App. 2; *Zorilla*

---

[18] Even if the ALJ had relied to a certain extent on the non-examining physician's RFC, it would not necessarily be error. An ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since those consultants are deemed to be qualified experts in the field of social security disability. *See* 20 C.F.R. §§ 404.1512 (b)(6), 404.1513(c), 404.1527(e). *See also Little v. Colvin*, No. 5:14-CV-63, 2015 WL 1399586, at *9 (N.D.N.Y. Mar. 26, 2015) ("State agency physicians are qualified as experts in the evaluation of medical issues in disability claims. As such, their opinions may constitute substantial evidence if they are consistent with the record as a whole.") (citations omitted). This reliance is appropriate when the opinions of the State Agency expert is consistent with the evidence as a whole, including the opinions of plaintiff's treating physicians. *Colvin, supra.*

*v. Chater*, 915 F. Supp. 662, 667 n.2 (S.D.N.Y. 1996). *See also* 20 C.F.R. §§ 404.1567 & 416.967. Each exertional category of work has its own Grid, which then takes into account the plaintiff's age, education, and previous work experience. *Id.* Based on these factors, the Grids help the ALJ determine whether plaintiff can engage in any other substantial work that exists in the national economy. *Id.*

"Although the grids are 'generally dispositive, exclusive reliance on [them] is inappropriate' when they do not fully account for the claimant's limitations." *Martin v. Astrue*, 337 F. App'x 87, 90 (2d Cir. 2009) (citation omitted). When significant nonexertional impairments are present or when exertional impairments do not fit squarely within Grid categories, the testimony of a vocational expert is required to support a finding of residual functional capacity for substantial gainful activity. *McConnell v. Astrue*, 6:03-CV-521 (TJM), 2008 WL 833968, at *21 (N.D.N.Y. Mar. 27, 2008) (citing, *inter alia*, *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986).

"If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert[,]" rather than relying solely on the Grids. *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (*citing Bapp*, 802 F.2d at 605). The mere existence of a nonexertional impairment does not automatically require consultation with a vocational expert, nor does it preclude reliance on the Guidelines. *Bapp*, 802 F.2d at 603. The requirement for a vocational expert is triggered when a nonexertional impairment causes an "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a

meaningful employment opportunity." *Id*. at 605-06. The appropriateness of applying the Grids and the necessity for expert testimony must be determined on a case-by-base basis. *Id*. at 605.

## B. Application

Plaintiff argues that the ALJ erred in failing to consult a VE based upon plaintiff's alleged inability to use his hands. (Pl.'s Br. at 10). The ALJ carefully considered plaintiff's non-exertional *environmental* limitations in finding that his non-exertional limitations would not significantly limit the full range of sedentary work. (T. 28). Because the court has found that the ALJ properly gave no weight to Dr. Restaino's RFC evaluation to the extent that she placed limitations on the use of plaintiff's hands,[19] while giving great weight to the rest of the report, the ALJ had no duty to consult a VE. The ALJ properly used the Grid as a "framework" for her decision and found that plaintiff had recovered the ability to perform sedentary work as of November 22, 2011. *See Zabala v. Astrue*, 595 F.3d at 411 ("[t]he ALJ found that Petitioner's mental condition did not limit her ability to perform unskilled work"; [t]hus, her nonexertional limitations did not result in an additional loss of work capacity, and the ALJ's use of the [Grids at step five] was permissible").

**WHEREFORE**, based on the findings above, it is

---

[19] As the court noted above, Dr. Restaino's RFC also stated that plaintiff **could** "sort, handle, or use paper/files." (T. 481). Sedentary work involves working with files and small objects. SSR 96-9P, 1996 WL 374185, at *3. Dr. Restaino's opinion regarding plaintiff's ability or inability in this regard is inconsistent. In addition, SSR 96-9P states that limitations on pushing and pulling do not erode the occupational base for sedentary work. Thus, even if plaintiff could only "occasionally" push and pull, it would still fail to limit his ability to perform the full range of sedentary work.

**RECOMMENDED**, that the decision of the Commissioner be affirmed, and the plaintiff's complaint be **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: April 1, 2015

Hon. Andrew T. Baxter
U.S. Magistrate Judge